UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALISON STIRM,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 2:22-cv-1330-CKD<br><br><br>MEMORANDUM OF DECISION<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

After conducting a seven-day bench trial on plaintiff's claim under the Federal Tort Claims Act, hearing closing arguments, and considering the parties' post-trial briefing, the Court finds in favor of plaintiff Alison Stirm in the amount of $1,535,748.00. The Court issues this memorandum with findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

**I.    Findings of Fact**

**The Collision**

1.    On June 11, 2021, Alison Stirm ("plaintiff" or "Mrs. Stirm") was riding her bicycle westbound on Canal Boulevard in San Joaquin County, California, on the far-right side of

---

[1] Any finding of fact more properly deemed a conclusion of law and any conclusion of law more properly deemed a finding of fact shall be so construed. See Miller v. Fenton, 474 U.S. 104, 113-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

1

the roadway.

2.     At the time of the crash, Joseph Graham was a United States postal worker delivering mail on behalf of his employer, the United States Postal Service.

3.     Mr. Graham was travelling eastbound on Canal Boulevard and was looking down at his odometer immediately before the collision. He crossed over the double yellow lines and hit Mrs. Stirm on her bicycle while he was not looking at the roadway. Mrs. Stirm landed on the ground in a concrete irrigation ditch. She remembers a thump and hearing the driver say "[s]he's awake." (Stirm Tr. 2/26/25 at 373-74.)

4.     Mrs. Stirm was transported by ambulance to San Joaquin General Hospital and remained in-patient at the hospital for two days before being discharged to her home.

### Plaintiff's Injuries

*Left Wrist/ Hand/ Finger/ Leg*

5.     Dr. Dowbak, an orthopedic surgeon, diagnosed plaintiff with an open fracture to her left wrist,[2] degloving of her left index finger, and various cuts and lacerations. (P Exh. 110-1 at 10-11.) Dr. Dowbak also treated plaintiff for material embedded in her leg and second-degree burns on her left leg. (Id. at 22.)

6.     Orthopedic surgeon Dr. Ting performed three separate surgeries, including three procedures on Mrs. Stirm's left wrist, two procedures on her left index finger, and a procedure on her left clavicle. One procedure included partial removal of the ulna in Mrs. Stirm's left arm in the hopes of recovering some rotational movement. (Ting Tr. 2/25/25 at 129-132; P Exh. 98-1, 98-2, 98-3.)

7.     Dr. Schroeder, an orthopedic surgeon and chief of hand surgery for the Department of Orthopedics at UCSF, diagnosed Mrs. Stirm with left wrist posttraumatic osteoarthritis and a painful neuroma on her amputated index finger. Dr. Schroeder performed two surgical procedures on Mrs. Stirm. (P Exh. 115-1 at 7, 10-11.) The first surgery performed by Dr. Schroeder on January 24, 2022, included a wrist fusion removing a section of the row of bones, a

---

[2] Mrs. Stirm is right-handed. (A. Stirm Tr. 2/26/25 at 407.)

2

PIN neurectomy (removal of a sensory nerve that carries pain signals from the wrist to help reduce pain), and a left index finger amputation revision that cut back the left finger bone to make it less prominent and cut back the radial digital nerve to prevent a recurrence of painful neuroma. (Id. at 16-17.) During the second surgery on October 10, 2022, Dr. Schroeder removed hardware from the previous wrist fusion, performed an extensor pollicis tenolysis to clean up scarring and inflammation around the tendon, performed an advanced technique called a regenerative peripheral nerve interface to prevent recurring pain, performed a distal ulna stabilization procedure using a tendon graft, and revised a scar in the supraclavicular region. (Id. at 24-25.)

8. Dr. Schroeder explained the distal ulna instability is difficult to treat and often leads to chronic pain and poor surgical outcomes. (P Exh. 115-1 at 30-31.) The only potential treatment left for plaintiff's distal ulna instability would be implantation of a distal ulna prosthetic. Dr. Schroeder testified it would be medically reasonable and appropriate for plaintiff to attempt the procedure. However, the implantation has a life span of only a 10-to-15 years, sacrifices motion, and does not return the patient to normal function. (Id. at 33-37.)

9. Dr. Schroeder testified Mrs. Stirm has significant limitations in the functional use of her left hand for precision tasks and personal functions and will likely continue to experience continuing pain in her wrist. (P Exh. 115-1 at 30-31.)

10. No future surgeries are scheduled as to plaintiff's left hand or wrist. (B. Stirm Tr. 2/24/25 at 94.)

11. The Court finds implantation of a distal ulna prosthetic is not shown to be reasonably certain to occur.

*Clavicle*

12. Mrs. Stirm suffered a subluxation or dislocation of her left clavicle resulting in surgery.

13. Dr. Heinz Hoenecke, plaintiff's treating orthopedic surgeon, found Mrs. Stirm continues to suffer from an unstable sternoclavicular joint and sternoclavicular subluxation and that further revision surgery would be medically appropriate to attempt fix her unstable sternoclavicular joint. (P Exh. 113-1 at 10, 12-13, 49.)

14. The Court finds a further revision surgery to Mrs. Stirm's left clavicle is reasonably certain to occur because of this incident. However, no evidence of the cost of the future left clavicle surgery was submitted pursuant to stipulation by the parties.

*Neck/Back/Occipital Neuralgia*

15. Mrs. Stirm had reported back pain preexisting the crash in 2016, but she had not received any treatment for it before the crash. She had no history of prior reported neck pain. (Rudin Tr. 3/3/25 at 603-05, 608-09; A Stirm 2/26/25 at 364-66.)

16. Mrs. Stirm saw her treating physician, Dr. Ting, within weeks of the crash, complaining of pain to her neck, back, left arm, left sternoclavicular area, chest, neck, right ankle, left knee and left shoulder. (Ting Tr. 2/25/25 at 122-123.) Dr. Ting referred her to Dr. Sontag for treatment. (Id. at 133.)

17. Dr. Sontag, a physician board certified in physical medicine and rehab as well as electrodiagnostic medicine, diagnosed Mrs. Stirm with disc bulges in her cervical spine and lumbar spine in July of 2021, and occipital neuralgia in June of 2022, resulting from the crash. (P Exh. 111-1 at 6, 12-13, 30.) Dr. Sontag treated plaintiff with various injections, including occipital nerve blocks, facet injections, and lumbar epidural injections. (Id. at 18-19, 24-25, 29-30.)

18. Dr. Sontag recommended the following treatment for Mrs. Stirm's pain in her head, neck, and back: (1) see a pain management physician once a month for the rest of her life; (2) receive bilateral occipital nerve blocks three times per year for the rest of her life; (3) receive two epidural injections per year for the rest of her life; (4) receive up to three cervical and paraspinal injections a year for the rest of her life; (5) have eight sessions with a pain psychologist per year for the rest of her life; (6) receive physical therapy eight times a year for the rest of her life; and (7) receive acupuncture eight times a year for the rest of her life. (P Exh. 111-1 at 36-39.)

19. After moving to San Diego in August of 2022 Mrs. Stirm began treatment with Dr. Miller, a physician who operates a private clinic and specializes in the treatment of pain. (P Exh. 112-1 at 8-9, 28; A. Stirm Tr. 2/26/25 at 414.)

20. Dr. Miller diagnosed plaintiff with occipital neuralgia as a result of the crash, described as a "headache caused by a nerve" with a "distinct headache pain pattern." (P Exh. 112-1 at 10.) Dr. Miller explained occipital neuralgia is a clinical diagnosis without any real test and that Dr. Miller based the diagnosis on plaintiff's reports of pain and relief from occipital nerve injections and occipital nerve blocks. (Id. at 11.) Dr. Miller has performed occipital nerve blocks and lumbar epidural injections for plaintiff with good results for pain relief. (Id. at 11, 50.)

21. Dr. Lobatz, plaintiff's retained expert neurologist, testified that occasional use of occipital nerve blocks would be warranted for plaintiff. (Lobatz Tr. 2/26/25 at 307-08.)

22. Dr. Miller testified it would be reasonable for plaintiff to receive facet injections to try to address her lower neck pain and to continue receiving epidural injections for her lower back pain. (P Exh. 112-1 at 14-15, 50.)

23. Dr. Tontz, plaintiff's retained orthopedic surgeon expert, recommended Mrs. Stirm receive occipital nerve blocks three times per year and lumbar epidural steroid injections two times a year for life. (Tontz Tr. 2/25/25 at 167-169.) These recommendations are based on plaintiff previously deriving benefit from them. (Id.) The lumbar epidural steroid injections are to treat Mrs. Stirm's radiculopathy, which is a diagnosis she had before the accident. (Id. at 179.)

24. Dr. Tontz also recommended plaintiff receive facet injections for the neck and low back based on a clinical diagnosis of facet syndrome in the neck and back. (Tontz Tr. 2/25/25 at 168-69.)

25. Dr. Rudin, defendant's retained orthopedic surgeon expert, testified plaintiff had mild degenerative disc disease prior to the accident. (Rudin Tr. 3/3/25 at 581.) In Dr. Rudin's opinion, plaintiff's spine was normal for her age. (Id. at 589.)

26. Dr. Rudin reviewed pre-incident and post-incident lumbar spine MRIs and opined the imaging findings were not acute or traumatic and did not arise from this incident. (Rudin Tr. 3/3/25 at 585-88.) Dr. Rudin's review of post-incident cervical CT and MRI studies showed no acute injury arising from this incident. (Id. at 583-585, 603-604.)

27. Dr. Rudin opined plaintiff would have the same neck and back pain complaints today even if the crash had not occurred. (Rudin Tr. 3/3/2025 at 603-05, 608-09.) Dr. Rudin

explained that people can have neck pain without a corresponding diagnosis, and that triathletes report high incidences of neck pain and have a 48 percent lifetime risk of neck pain. (Id. at 608.) He testified cyclists commonly get neck pain and posterior head pain from holding the cycling position for so long. (Id. at 611.)

28. Dr. Rudin testified lumbar epidural steroid injections are not indicated and opined that plaintiff's current low back complaints are caused by preexisting degenerative changes. (Rudin Tr. 3/03/25 at 588, 604.)

29. Dr. Rudin testified facet syndrome is a radiographic and clinical diagnosis, and that cervical facet injections are not indicated in the absence of a facet arthritis or arthropathy or radiographic findings with cervical facet arthropathy. (Rudin Tr. 3/03/25 at 588, 607.)

30. Dr. Rudin testified plaintiff's diagnosis of occipital neuralgia does not have a spinal cause. (Rudin Tr. 3/03/25 at 599-600.) Plaintiff does not need occipital nerve blocks in Dr. Rudin's opinion because the MRI scan does not show pinching of or pressure on the C2 nerve. (Id. at 589.)

31. Dr. Rudin testified that no further medical care for plaintiff's cervical or lumbar spine is needed because the CT and MRI studies show no acute injury and the temporary sprains and strains suffered should have resolved. (Rudin Tr. 3/03/25 at 583-85, 590, 604.) However, MRIs have detection limitations and soft tissue injuries can cause pain but not be necessarily visible with MRI. (Id. at 597-98.)

32. Dr. Rudin agreed therapy physical therapy services and acupuncture would be reasonable courses to treat plaintiff's symptoms. (Rudin Tr. 3/03/25 at 590-91, 605.) He further agreed some use of injections for occipital neuralgia, occipital nerve blocks, and potentially, lumbar facet blocks and lumbar epidural injections could be reasonable to treat Mrs. Stirm's symptoms. (Id. at 590-91, 605.)

33. Mrs. Stirm testified that for the first year after the crash she suffered constant and intense pain "like having a pin in your skull" which was helped by the occipital injections. (A. Stirm Tr. 2/26/25 at 383.) At the time of trial, she testified she gets headaches a couple of times per week. (Id. at 384.)

34. Asked about her neck, Mrs. Stirm testified her main issue is the lack of motion. (A. Stirm Tr. 2/26/25 at 387.) Mrs. Stirm testified her low back is constantly aching. (Id.) At the time of trial she was "long overdue" for pain relief injections for her neck and back. (Id. at 391.)

35. The Court finds the crash caused or exacerbated plaintiff's neck and back pain and occipital neuralgia symptoms, which were initially worse and which have improved some during the course of her recovery. The Court finds Dr. Rudin's testimony to be credible that plaintiff's CT and MRI studies show no acute injury and that plaintiff has mild degenerative disc disease which pre-existed the crash.

36. The Court finds further medical care reasonably necessary because of the incident includes physical therapy services, acupuncture, and some pain management injections. However, plaintiff has not shown pain management injections at the frequency suggested by her life care planning expert for the rest of her life are reasonably certain to occur because of the incident. The witness testimony does not establish that occipital or cervical Botox injections or further cervical facet injections are reasonably certain to occur. Further medical care reasonably necessary because of the crash includes some occasional further use of occipital nerve blocks and lumbar epidural injections as needed, up to two times per year.

37. To calculate the cost of plaintiff's future epidural injections, Mrs. Albee, plaintiff's life care planning expert, used the pricing for an ambulatory surgery center because that is where Mrs. Stirm has been receiving her injections from Dr. Miller and it is what Ms. Albee sees most frequently in her practice. (Albee Tr. 2/26/25 at 327-328.) However, Mrs. Albee also agreed with the cost assessment for lumbar steroid injections performed in a clinical setting such as a doctor's office in Mrs. Stirm's area as calculated by Ms. Van Horn, defendant's life care planning expert. (Id. at 334.) The Court finds the reasonable value of the lumbar steroid injections is as calculated by Ms. Van Horn.

*Brain Injury and Cognitive Functioning*

38. Mrs. Stirm was assessed on the Glasgow Coma Scale ("GCS"), which assesses neurological functioning, and received the highest score of 15 out of 15, which she maintained throughout the paramedic's care at the scene of the crash and in transport to the hospital. (Gabbert

1 | Tr. 2/24/25 at 43-44, 46-47.)

2 |     39.    Mrs. Stirm sustained a mild traumatic brain injury, which is synonymous with concussion, because of the crash. (Lobatz Tr. 2/26/25 at 287.)

    40.    Plaintiff has not been seen by a treating neurologist following this incident. (Lobatz Tr. 2/26/25 at 308-309.)

    41.    Plaintiff's brain MRIs showed white matter hyperintensities or "white spots" which could be a sheering injury from jolt to the brain. (Lobatz Tr. 2/26/25 at 299-300; P Exh. 114-1 at 15, 20.) These abnormalities could preexist the crash or could be new. (Lobatz Tr. 2/26/2025 at 297.)

    42.    Plaintiff's brain MRIs did not show any specific traumatic brain injury. (Strassberg Tr. 3/4/2025 at 657, 670.) Neurological examination by Dr. Strassberg, defendant's retained neurologist and psychiatrist expert, was normal. (Id. at 657.)

    43.    Dr. Lobatz testified Mrs. Stirm reported symptoms including headaches, sleep difficulties, memory problems, mood changes, anxiety and increased depression, hearing difficulties, and blurry vision. Considered together, these symptoms support a diagnosis of post-concussive syndrome, which is when a patient continues to experience difficulties with symptoms of a concussion beyond the first couple of weeks. (Lobatz Tr. 2/26/25 at 286-287, 293-94, 298.)

    44.    Dr. Schaeffer, plaintiff's retained expert neuropsychologist, reviewed Mrs. Stirm's test data, clinical history, brain imaging, and information from interviews of Mrs. Stirm and her husband and opined she is suffering from a complex mild traumatic brain injury. (Schaeffer Tr. 2/25/25 at 197-198.)

    45.    Dr. Delis, defendant's retained neuropsychologist, found plaintiff's cognitive testing to be normal and found no cognitive impairment that affects daily activities. (Delis Tr. 3/3/25 at 534-536.)

    46.    Dr. Strassberg, defendant's retained neurologist and psychiatrist expert, testified Mrs. Stirm had good ability to do things requiring neurocognitive abilities. (Strassberg Tr. 3/4/25 at 656.) Dr. Strassberg opined plaintiff likely recovered from any associated neurocognitive problems over the course of two to three months, and that other issues such as emotional issues

8

might be creating difficulty for her. (Id. at 656-57.)

47. Dr. Tontz, plaintiff's retained orthopedic surgeon expert, performed a neurological examination of plaintiff on December 13, 2023, with normal results. (Tontz Tr. 2/25/25 at 177.)

48. The Court finds Mrs. Stirm sustained a concussion because of the collision. The court finds Dr. Delis' testimony that plaintiff has no cognitive impairment affecting her daily activities from the crash to be credible and finds Mrs. Stirm has no continuing neurocognitive problems associated with the concussion. No future medical care for neurocognitive deficits because of the crash is reasonably certain to occur in the future because of this incident.

*PTSD/ Depression/ Daily Functioning*

49. The crash increased plaintiff's preexisting depression. (Reading Tr. 2/26/25 at 273-274; Delis Tr. 3/3/25 at 535.) Mrs. Stirm had not needed mental health treatment for some time prior to the crash. (A. Stirm Tr. 2/26/25 at 367.)

50. Mrs. Stirm developed moderate to severe Post Traumatic Stress Disorder from the crash. (Santucci Tr. 2/26/25 at 233; Delis Tr. 3/03/25 at 536.)

51. The Court finds Mrs. Stirm suffers from residual emotional symptoms including PTSD because of the crash. Nevertheless, her activities demonstrate she is highly functioning. When her husband is working and away from home for two to four days each week, Mrs. Stirm cares for her three daughters alone. She cooks, hikes, drives her daughters to school and extracurricular activities, and drives to pick up her husband from the airport. (B. Stirm Tr. 2/24/25 at 94-96.)

52. Future care for plaintiff's PTSD and emotional symptoms reasonably certain to occur because of the crash includes psychotherapy, couples therapy, and family therapy. (Delis Tr. 3/3/25 at 537-538; Strassberg Tr. 3/4/25 at 663.)

**Economic Damages**

*Past Medical Expenses*

53. The parties stipulated that Mrs. Stirm's recoverable past medical specials are $255,000.00. (ECF 76).

////

*Present Value of Future Medical Expenses*

54. The cost of Mrs. Stirm's reasonably necessary future medical care based on the opinions and recommendations of plaintiff's witnesses is summarized by Ms. Albee, plaintiff's retained life care planning expert. (P Exh. 36.) Mr. Mills, plaintiff's retained expert economist, calculated the present value of Ms. Albee's future life care plan to be $5,310,152. (Mills Tr. 2/27/25 at 496.)

55. Defendant's retained life care planning expert, Ms. Van Horn, also summarized the future medical care reasonably certain to occur in the future because of this incident in a lifecare plan. (D Ex. CC.) Defendant's retained expert economist, Erik Volk, calculated the present value of Ms. Van Horn's life care plan to be $211,263. (Volk Tr. 3/4/25 at 687.)

56. The present value of plaintiff's future medical expenses is calculated using a life expectancy for Mrs. Stirm of 43.35 additional years. (Volk Tr. 3/4/25 at 691.)

57. The Court concludes the present value of the reasonable cost of medical care Mrs. Stirm is reasonably certain to need in the future is $580,748.00, based on the following:

    Routine Medical Care: $2,011.00

    Non-Routine Evaluations (psychotherapy, couples therapy, and family therapy): $45,513.00

    Therapy Services (acupuncture and physical therapy): $67,309.00

    Durable Medical Equipment & Supplies: $3,579.00

    Diagnostic Testing: $90,979.00

    Medications:  $129,316.00

    Invasive Procedures/ Surgical Interventions: $242,041.00

    Ancillary Supportive Services: 0.00

    Total: $580,748.00

*Future Earning Capacity*

58. Mrs. Stirm is a 2008 graduate of Azusa Pacific University with a communications degree and a minor in leadership. (A. Stirm Tr. 2/26/25 at 342.) She has worked as an event planner for the San Francisco 49ers, for the Southeastern United Dairy Industry Association, for a

professional equestrian rider, and at a bakery. (Id. at 412-413.)

59. After Mrs. Stirm's first child was born in July 2012, and up until the time of the accident, she was a stay-at-home mom and did not have employment for pay. (A. Stirm Tr. 2/26/25 at 413-14.)

60. Mrs. Stirm had a goal to become a nurse. She had not applied to nursing school. (A. Stirm Tr. 2/26/25 at 422.)

61. The Court finds plaintiff is currently able to work. (Cohen Tr. 3/03/25 at 555; Rudin Tr. 3/03/25 at 610.)

62. Vocational Rehabilitation Consultant Dr. Sarkisian's opinion that plaintiff's current earning capacity is zero is based in part on plaintiff's reported pain levels and her own perceived lack of functioning, as related to her doctors. (P Exh. 28-12.) Given the extent of activities plaintiff has undertaken since the crash as demonstrated by witness testimony and surveillance video, the Court does not find this testimony credible.

### Noneconomic Damages

63. Mrs. Stirm has had six surgeries and attended hundreds of appointments attributed to her injuries from the crash. (A. Stirm Tr. 2/26/25 at 381-382.)

64. Following the crash, she can no longer engage in athletics training with the same intensity. (A. Stirm Tr. 2/26/25 at 389-90.) Running and sitting make her pain worse. (Id. at 389.) Mrs. Stirm has lost her ability to compete at a high level in triathlons and the social opportunities provided by competitive sports and no longer enjoys the peace of cycling. (Id. at 389, 430.)

65. Mrs. Stirm stated she has clavicle pain every day and rated the pain in her finger at "100 percent every day at over 10." (A. Stirm Tr. 2/26/25 at 388.) On a scale of 1 to 10, she rated her wrist pain at 9 or 8, neck pain at 7 or 8, and low back pain at 8 or 7. (Id. at 387-88.)

66. Since the accident, Mrs. Stirm has travelled and taken long flights, attended professional sports games, gone hiking and kayaking, rollerbladed, paddleboarded, and body surfed in the ocean. (A. Stirm Tr. 2/26/25 at 408-411; B. Stirm Tr. 2/24/2025 at 96-99.)

67. Mrs. Stirm testified she can no longer take 10-mile runs, but she hikes up to four to six miles four times per week with her daughters and runs up to five to six miles twice per week.

(A. Stirm Tr. 2/26/25 at 389, 430.)

68.     Chad Conner, an investigator, was hired by the United States to surveil plaintiff in April of 2025 and testified about his investigation. (Conner Tr. 2/26/25 at 247-48.) Mr. Conner followed plaintiff for three and a half days. He video-recorded plaintiff during the surveillance and testified about several excerpts played at trial. (Id. at 249-59.) Mrs. Stirm acknowledged the accuracy of these video excerpts depicting her working out at a gym, unloading a car and kicking the door closed, bending over to water plants while holding items in her left hand, and picking up her daughter with both hands to place her in the car. (Id. at 431-432.)

69.     Mrs. Stirm has experienced and will experience physical pain, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, and emotional distress. However, the Court finds plaintiff's reports of current pain levels and the extent of her own perceived lack of functioning are not credible given the extent of activities she has undertaken as demonstrated by witness testimony and surveillance video.

70.     The Court concludes that $700,000.00 is reasonable compensation for her noneconomic damages.

## II.     Conclusions of Law

### Liability

1.     Under the Federal Tort Claims Act, the liability of the United States is determined in the same manner as if the United States were a private individual under the law of the state where the incident occurred. See Anderson v. United States, 55 F.3d 1379, 1381 (9th Cir. 1995) (citing 28 U.S.C. §§ 1346(b)(1), 2674).

2.     Plaintiff has the burden to prove negligence by the preponderance of the evidence and must prove all the following elements: "(a) a legal duty to use due care; (b) a breach of such duty; [and] (c) the breach as a proximate or legal cause of the resulting injury." See Cal. Civ. Code § 1714(a); Ladd v. County of San Mateo, 12 Cal. 4th 913, 917-18 (1996); Judicial Council of California Civil Jury Instruction ("CACI") 400.

3.     A driver operating a motor vehicle owes a duty of care toward pedestrians and other people operating other vehicles on the roadway. Bryant v. Glastetter, 32 Cal.App.4th 770,

779 (1995).

4. To prove negligence per se, a plaintiff must prove: (1) Defendant violated a law; and (2) the violation of the law was a substantial factor in the plaintiff's harm. Toste v. CalPortland Construction, 245 Cal.App.4th 362, 371 (2016); CACI 418.

5. Mr. Graham violated section 21460 of the California Vehicle Code by crossing the double parallel solid yellow lines separating the eastbound and westbound lanes of Canal Boulevard prior to the crash. This violation was a substantial factor in causing the collision and injuries to plaintiff.

6. Plaintiff was among the class of persons section 21460 of the California Vehicle Code was intended to protect and the harm she suffered was the type of harm the statute was intended to protect against.

7. Graham failed to exercise reasonable care while operating the USPS vehicle on Canal Boulevard on June 11, 2021, by failing to pay attention to the roadway while operating a vehicle, failing to pay attention to traffic traveling in the westbound lane, driving the USPS vehicle into the westbound lane while heading eastbound, and failing to keep the USPS vehicle to the right of the double parallel solid yellow line separating the eastbound and westbound lanes.

8. Graham's negligence was the sole cause of the collision. Plaintiff shares no fault for the collision. Accordingly, the United States is 100% liable for the injuries, losses, and damages Mrs. Stirm suffered as a result of negligence of its employee who was acting in the course and scope of his employment at the time he caused the collision.

**Damages**

*Medical Expenses*

9. A plaintiff is not entitled to recover damages for any preexisting physical or emotional condition, but she may recover damages if such condition was aggravated by a defendant's wrongful conduct. Rideau v. Los Angeles Transit Lines, 124 Cal.App.2d 466, 471 (1954) see also CACI 3928.

10. The fact of harm must be proved with reasonable certainty but there is no requirement that a plaintiff prove with certainty the extent of the harm suffered as a result of the

defendant's conduct. Clemente v. State of California, 40 Cal.3d 202, 219 (1985).

11. A person injured by another's tortious conduct is entitled to recover "the reasonable value of medical care and services reasonably required and attributable to the tort." Hanif v. Housing Authority of Yolo County, 200 Cal.App.3d 635, 640 (1988); see also CACI 3903A. This includes economic damages for past medical treatment as well as future medical treatment. Markow v. Rosner, 3 Cal.App.5th 1027, 1050 (2017). Plaintiff is entitled to recover "the reasonable cost of reasonably necessary medical care that [she] is reasonably certain to need in the future." Bermudez v. Cioleck, 237 Cal. App. 4th 1311, 1338 (2015), as modified on denial of reh'g (July 20, 2015), review denied (Sept. 9, 2015). The appropriate measure of future medical damages is the lesser of (1) the amount that will be paid or incurred or (2) the reasonable value of the medical services that will be provided. Id. at 1330; Corenbaum v. Lampkin, 215 Cal. App. 4th 1308, 1325 (2013).

12. Plaintiff's recoverable past medical damages are $255,000.00.

13. The Court finds that $580,748.00 is reasonable compensation for plaintiff's future medical expenses as set forth above.

*Lost Earning Capacity*

14. To recover damages for lost earning capacity as a result of an injury, a plaintiff must prove: (1) that it is reasonably certain that their injuries will cause them to earn less money in the future than they could have otherwise earned; and (2) the reasonable value of the loss. Licudine v. Cedards-Sinai Medical Center, 3 Cal.App.5th 881, 887 (2016); CACI 3903D.

15. A fact-finder tasked with evaluating a plaintiff's prayer for prospective loss of earning capacity must answer two questions: (1) did the plaintiff suffer a loss in her earning capacity as a result of her injury; and if so, (2) how is that loss to be valued? Licudine v. Cedars-Sinai Med. Ctr., 3 Cal. App. 5th 881, 892 (2016). As to the first question, a jury may award damages for a plaintiff's loss of earning capacity only if the plaintiff is "reasonably certain to suffer a loss of future earnings." Id. As to the second question, "the jury must look to the earning capacity of the career choices that the plaintiff had a reasonable probability of achieving." Id. at 894. "[W]here a young plaintiff's injury prevents him or her from pursuing a specific career,

courts have generally required some proof that the plaintiff is far along in his or her training or experience. Where she adduces such proof, courts have looked to that career's earnings to fix lost earning capacity." Licudine, 3 Cal. App. 5th at 896.

16. Plaintiff has not suffered loss of earning capacity damages because damages are speculative with respect to plaintiff's goal to be a nurse. Otherwise, plaintiff has not proved any loss with a reasonable certainty because she is currently able to work.

*Noneconomic Damages*

71. Plaintiff has suffered and will suffer noneconomic damages as a result of the June 11, 2021, collision and her injuries caused by the collision.

72. California law does not provide a definite standard or method of calculation by which to fix reasonable compensation for noneconomic damages. A fact-finder must "impartially determine pain and suffering damages based upon evidence specific to the plaintiff[.]" Loth v. Truck-A-Way Corp., 60 Cal. App. 4th 757, 764 (1998).

73. The Court finds $700,000.00 is reasonable compensation for Mrs. Stirm's past and future noneconomic damages.

**Conclusion**

For the reasons stated above, the Court hereby finds for plaintiff Alison Stirm in the amount of $1,535,748 on her claim brought under the Federal Tort Claims Act. The Clerk of the Court is instructed to enter judgment accordingly.

Dated: September 22, 2025

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

8, Stirm22cv1330.ffcl